E. King, Myron Moskovitz for appellant, William Bell for appellee. Mr. Moskovitz, you want to reserve some time for rebuttal? Yes, Your Honor. I'd like to reserve five minutes. Very good. Go ahead, please. Good morning, Your Honor. Myron Moskovitz for the appellant, Wolverine. In this case, here's the key issue. Wolverine filed its petition for involuntary bankruptcy on August 31, 2022. And John moved to dismiss it for the following reason. He had more than 12 creditors, which triggered the requirement that Wolverine have at least three. Wolverine had three petitioners, including a jointer by a company called Fence Factory. Two of them, of the creditors, were big judgments. Wolverine had over $7 million judgment, and the insurance company of the West had about $11 million. There were actually three other large judgments, and Wolverine could have gotten one of them to join. The problem was that the debtor, John, had arranged for his son to purchase those debts. And that stood as an obstacle to everything that Wolverine was trying to do in this case. So the only choice that Wolverine had was to get one of the small debtors. John had listed something like 44 small creditors in a list he furnished the court. One of them was Fence Factory. John had asserted that this was an ongoing relationship with ongoing debts. Go ahead, please. I prefer that you use last names just as a matter of courtesy. I'd appreciate sticking to last names, please. Well, we have two people named King. How about Mr.? We're just doing one at a time. I'll be happy to do that. Thank you. So Mr. King listed Fence Factory as one of his creditors, and Wolverine saw that and went to Fence Factory. He said, would you like to join? They joined, and now you have three. And now Mr. King claimed that, well, the debt that he had to Fence Factory on the day of the petition had been paid. It was only $44, and it was recurring debt every month for the rental of a fence. And he had paid it, so Fence Factory was no longer qualified. Do you know whether we can tell from the record whether that rent was to be paid in advance or in arrears? No, there's testimony on that from the CEO of Fence Factory about how that was done. The billing was, let me see if I can get the citation of the record on that. This was Mr. Bennett, and he testified that the way they did it was they billed at the end of the month for the prior month's usage. And this is at the reporter's transcript of October 3, 2023, at page 254, 255. So that's how they did it. So at the time that Fence Factory joined the petition, yes, the bill that was due at the time the petition was originally filed had been paid. But we have three contentions about that. One is that's good enough in itself. The fact that the debt was due on the date the petition was filed is adequate under Section 303C because he was the holder of that particular debt. And the statute doesn't say it has to be done on the date of the joinder, which is what the trial court held. The statute doesn't say that. Well, the statute also says you're supposed to judge these things from the joiner's perspective as if it were on the petition date, right? That's a shorthand version of the statute? Yeah, that's exactly right. Okay. I mean, I don't want to take all the dramatic irony out of your next argument, but I think that's where you were going. That is. Okay. And there's a very good reason for that. If you don't have that rule, then the debtor who wants to manipulate things and get rid of this involuntary petition can simply pay off all these very small debtors and block the petitioner who's bringing it from going ahead with it. And that's exactly what happened here. That seems kind of the reverse here. I understand that if someone joins and then is later paid, but Fence Factor did not, was not an original petitioner. It joined after it was paid, which seems like if you're looking at abuse, that's the potential for abuse there, having creditors that no longer have an interest. And that gets you to the recurring nature, which I think maybe is where I'd like to hear some additional. But, I mean, if it was not for the recurring, your point is that it was still valid for Fence Factor to join, notwithstanding the fact it would not have any dog in that hunt anymore, would it? Well, here's the problem. You talk about the potential for abuse. The potential for abuse, and we contend there was actual abuse here, not just potential abuse. Mr. King purchased the big debtors judgments, big creditors judgments, which would have solved this whole problem. So there was only two big ones. And then he lists the little ones. Now, one of the purposes of having the debtor list all the creditors is to give the petitioner the opportunity to bring in one of those. And that's exactly what Wolverine did. They found one. And then what happens? He pays them off. Mr. King pays them off. So there's the potential for abuse. And the statute is not clear on this. The court uses the word holding, but it doesn't, statute doesn't really say on what date. So as a matter of policy, I think the court should hold in this situation, it relates back. And there are cases that we cite in our brief that hold that. Now, you mentioned a recurring debt, and that is what we have here. So on the date of the joinder, there actually were two debts that Mr. King owed to Fence Factory. One was the outstanding bill that was for another $44. And that was, let me get the dates on that for you. This was on May 1, 2023. Can I interrupt and ask you, one of the things that confuses me is the record isn't clear what the underlying debt emanates from. It's for the fence. Is there a, does the record indicate whether there was a long-term agreement? Is this month to month? What is the actual nature of the obligation? And is it in the record? I don't think it's in the record, but it was going on for a long time. Is there a difference, though, between if it is pursuant to a long-term obligation, such that that obligation pre-petition was known and was not contingent but had not matured, versus what might effectively be a month to month obligation, which only arises if it is continued for the next month, in which case it might be contingent. Well, that's a very good point, Your Honor. And apparently it was overlooked by trial counsel, and the evidence on that was never developed. It was month to month. Can I follow up with that? I saw no indication of any long-term lease, so I can assume it was month to month. To the extent there were some disputes here, there was not a dispute about liability or amount, right, with respect to Fence Factory? Correct? About the $44? Yeah, there was no dispute about liability or amount, right? I mean, that was not part of the dispute. Okay, okay. So I think Judge Baker's question is a great one, what's the nature of the debt. But one way or the other, it appears to be recurring, which I think is really the question that we're trying to focus in on here, that something holding is one thing, but, you know, it modifies the term claim, which is awfully broad. And what I think we're trying to figure out here is how do we think about a recurring debt like this? So go ahead and give us your thoughts about that. Okay, but look, when we're talking about the evidence, we should keep in mind that this arose on a motion for summary judgment by the debtor. And that's what the debtor himself characterized it as, and that's what the trial judge said in his opinion. Yeah, but, you know, can I just try to give you a hand here? I wouldn't worry about that. I mean, there was a trial, number one. I'm not sure if there's any disputed questions or fact here one way or the other. And you're within your five minutes if you want to reserve it. Well, the point is, in a summary judgment motion, the person bringing the motion has the burden of proof. All right. So, for example, with this issue I'm talking about now, this gap claim, about the May 1, 2023 billing for the past month, there's no evidence that it was paid. And that defect falls on John. He had the burden of proof that he had paid. He didn't do it. So we have to assume that that May 1, 2023 debt was not paid. And so that debt was pending at the time Fence Factory joined. Okay. Sorry, go ahead. And in addition, there's another gap claim, and that is the Fence Factory joined on May 12. So there are 12 days in May that were also accrued as a debt and not paid. Now, you know, we're talking about two very large claims here by the petitioners, $7 million and $11 million. And here we are fussing about $44. And it seems strange, but it's the debtor that put us in this situation, buying up the other multimillion-dollar debts and listing Fence Factory in his list of creditors. So we end up quarreling and fighting over this tiny debt, which has huge consequences for my client, Wolverine. Wolverine has been trying to—  You have about three minutes left. I just want to remind you, if you want to reserve that time, you could stop now or you can keep going. It's up to you. I'll stop now. Okay. All right. Thank you. Mr. Beal. Yes. Good morning. May it please the Court. I'm William Bell, Bell and Burkhardt. I'm here on behalf of John King. So let's start by talking about Fence Factory. I mean, there's a paucity of authority for this kind of a situation. Well, congratulations. We couldn't find any either, and here we are. Because it would never happen. Yeah. And, frankly, I know I had a couple of opportunities to talk to Mr. Bennett on deposition, and then I examined him at the trial, and he never would admit that anything happened. But something had to happen. Why in the world would a creditor who's been paid join a case and insert themselves into a litigation? He admitted, both at deposition and at trial, that it was a fiduciary default by him, in his capacity as president of his corporation, to have joined and inserted himself into this thing. So something had to happen. And whether it was the silver tongue of Mr. O'Neill, who's the principal of Wolverine. What does that go to? It goes to one thing. It goes to Mr. Moskowitz's policy argument. Why would one want to protect Fence Factory and let a creditor who's already been paid insert themselves into a case? It doesn't make sense. Because there are bigger fishes to fry than involuntary. That's why. That's why you need three. Right? And they knew they needed three. But let's, can I ask you a favor? Sure. Let's go to the question of holding versus a recurring claim.  That's where I think we really need your help, okay? Yeah, and that's the, well, first of all, there's no evidence of a recurring claim. And Mr. Moskowitz. That's the problem. Because there is. Because there's evidence of later payments. Right. I don't believe that any of them. Well, obligation. And it's in the record that there's another debt, all of these things. And it seems implicit from the testimony that was taken. He doesn't say at trial. And, first of all, one thing Mr. Moskowitz doesn't refer to at all is the pretrial stipulation. I mean, we entered into a 25-page pretrial stipulation with hundreds of admitted facts and a few disputed facts. And there is absolutely nothing in there about this gap period claim. Nothing. There is no stipulated fact. There is no fact to be disputed about whether there was a claim in May or in March. One of the things, they talk about May as the date of joinder. But Mr. Bennett signed the joinder back in March. And Wolverine held on to it for tactical reasons for 60 days before filing it. So, is it March when he signed it? Is it May when it got filed? I'm looking at page 254 of the transcript. And the question was asked, as of May 12, 2023, when we filed the joinder, did you retain a fence? Did you rent a fence to the Kings? Yes. Okay. But it doesn't say there was a debt. And it doesn't say that when the payments were made. I think there's a fair inference that if there was a fence from this company, there was some payment that was associated with it. I'm just saying if the gap period claim was to be used by the petitioning creditors as a third credit, they had to raise that in the pretrial stipulation. The pretrial stipulation says these are the issues to be tried and no others. I have a question. Everybody talks about this, both you and Mr. Moskovitz, as if there's maybe multiple claims, $44 a month for some number of months. I agree. You seem to think there may not have been evidence a few further months. But I'm not sure that's the case. I mean, if there is a written or an oral lease or rental agreement or whatever, I think there's just one claim. With installments coming on, but not multiple debts. Right. So the fact that one month's rent was paid doesn't mean there's no claim left, unless the fence got returned. Well, the fence did eventually get returned. It's not in the record, though, is it? No, of course not. But then again, what the situation was in March or in May is not in the record either, and it's not raised as an issue. And that's huge. I mean, because if they were going to say that the gap period claim is one of the three records. Can I stop you for a second? I'm sorry to interrupt you. Conceptually, play along with us here. There's a difference between whether there was a gap period claim, which goes to the way Judge Farris framed the question, and whether this is a recurring debt, such that, you know, you may be invoiced in one month and another. It doesn't change the fact that it's a recurring claim because there is this arrangement. Somebody's still using that fence. I mean, there's a difference between those concepts, right? Well, yes, but going back to what Judge Fraker asked Mr. Moskowitz. So there's a difference between a lease, which says for 12 months you're going to rent the whole group.  And you've got to make 12 payments. Sure. And a month-to-month agreement where at the end of any month you can give the fence back. But they didn't, as far as we know. Right, but the point is that as of the petition date, there's only the current month. But the point is, to Judge Farris's point, there's a difference between billing and conceding, thinking every one of those is a separate claim and looking at the nature of this, which is it is a recurring claim. It's simply unmatured. That's the difference. So help me out with that part. Well, I don't know. I mean, I really don't think that that's true. I don't think, for example, if you live in an apartment and you file a bankruptcy case, yes, maybe your current rent is something that the landlord can claim. But if you have a month-to-month tenancy, next month, although you're not planning on moving, but the second and the third and the fourth month, those are not claims in the case. Yeah, but we're talking about something that's essentially a standing argument here. Can one commence an involuntary? That's a different matter, right? You're disenfranchising somebody on the theory that the fact you were paid this increment on this date disenfranchises you. That's the argument, right? Well, yes. Okay. But, again, what happened was, and first of all, to talk about the whole issue, I mean, there's a number of cases. Vortex is probably the leading case in the Ninth Circuit to talk about. You can't pay the petitioning creditor off and have them lose standing. We all understand that. We all know that's the law. But we have to look at the dates here. The invoice was August 31st. The payment was September 2nd. And the service of the involuntary was September 9th. So this is the exact opposite of any manipulation by the debtors. Well, if you're focusing simply on what was owed at the petition date as one claim, yes, I agree. I mean, they didn't even know there was a case when this claim got paid. And the other thing that's important is they talk about how. . . Wasn't there eight or nine days of rent, depending on how you count, due on September 9th? Or owed, excuse me, owed on September 9th? Maybe. I don't know. It's hard to say. And, I mean, you know, I mean, that. . . It's difficult to say because whether the invoice matters or not. I mean, that's an arguable point. By the way, don't take any. . . I mean, we're struggling with this as. . . There's no hostility here. We're trying to figure out something. There's simply nothing guiding us here. And I have to take exception with Mr. Moskowitz's statement that there's nothing in the code because 303C says that at the time of the joinder, the joining party has to be holding a claim. Not to have held a claim on the petition date. Holding. And that's where Judge Clifford went. Again, the reason that there's no law on this is because nobody would ever do what Mr. Bennett, what Fence Factory did. Nobody would ever do this. And we don't know why they did it. Well, I'm. . . If you follow the theory, which you probably don't. If you follow the theory that the rent sort of accrues daily and they filed their joinder in the middle of a month, wouldn't that suggest that they were holding a claim on that date? Maybe not the $44 that was paid before. I'm just telling you that there was no evidence of that. It was not put into the trial. It was not raised as an issue by the petitioning creditors who all signed a 25-page pretrial stipulation that said these are the issues. They didn't raise it. They didn't prove it. And this comes back to this whole conniption that the appellant gets into to try to shift the burden of proof from them proving Fence Factory had a claim to me proving Fence Factory didn't have a claim. I mean, that's the whole part of whether they say it was summary judgment. I mean, we have a pretrial stipulation in which the parties all admitted that we were having a trial. They said these are the issues we're trying, we're going to trial. There were trials used in there, I don't know, 40 times. And so the idea that it was, I mean, I know Judge Clifford said he was deciding a summary judgment motion. And the other thing is in the reply brief there was a ton of argument about how the court, if it was going to do a trial, needed to decide whether the debtors were generally paying their debts as they become due. And he said, and you didn't even do that, therefore you can tell there wasn't a trial. Well, there's, I don't know, 12 stipulated facts about that issue in the pretrial stipulation. It's an issue in the pretrial stipulation. And Judge Clifford just said I don't need to reach it because I find that there aren't three creditors. And there really weren't any facts of dispute about that. I mean, that didn't get it. It's not, you're not arguing that's harmless error because it also got adjudicated. You're arguing he never got there, right? He didn't get there. But I think that the facts are the facts, and the facts are that we have, that the kings had, you know, these judgment claims that aren't getting paid and dozens of people that are getting paid. And is that generally paying your debts as they become due or not? And, frankly, those, I mean, those facts were all admitted. There's no dispute about that. And the court could find that that is an additional grounds for affirmance because the kings were generally paying their debts as they become due. I think that that's within the power of this panel. The court can certainly affirm a lower court judgment based on any ground that's in the record. Well, given what was actually raised, if we were to disagree with you, and if we were to reverse on the question of Fence Factory's standing, I mean, Judge Clifford still has to decide the issue of Fence Factory withdrawing the petition, right? Withdrawing the jointer. Well, and in addition. We would demand for him to do that, wouldn't we? In addition, Vortex says that if you have been misled into joining, you can withdraw. But that, I mean, my point is that would be the next logical step. Were we to agree with Mr. Moskowitz? Well, we have two arguments on that. The other thing is Fence Factory brought in, I'm sorry, Wolverine brought in East West Bank. So at the time that Fence Factory was trying to withdraw, there were four alleged petitioning creditors. And so the argument that I can't allow them to withdraw because then there wouldn't be three. My point is only that's a Judge Clifford decision, not us, right? I guess. I mean, we cross-appealed on that issue. So the court could reverse him on his decision not to accept their withdrawal. Yeah, I got that right. I think I didn't have the wrong number of negatives in that statement. But I think that, you know, like 90% of the appellant's argument is completely eviscerated by the fact that they entered into a stipulated pretrial statement. And that was, in fact, made an order by the court. And I think that that's an extremely important thing. These issues were not tried. They were not raised. And, therefore, they can't be brought up on appeal. And, I mean, I don't think that anybody disagrees with that statement of the law. So the issue of, you know, and there's just nothing in their briefs about this pretrial stipulation. I don't know your districts as well as I know the Central District. But this pretrial stipulation is a huge document for us in the Central District. Every single trial. And this is why we try cases in a day or in two days that in the Superior Court would take a month. Because we admit everything. And, typically, we admit all the documents. I mean, we had, one of the interesting things about this case is that Wolverine sent 200 subpoenas out for documents to everybody that the Kings had ever done business with. And they put in one piece of paper as evidence in their trial. One document, which they didn't get with any of the 200 subpoenas. A one-page statement of the fictitious business name statement that said that King Ventures was a John King entity. And that's the only document that they submitted. The only one. And so, but this is all done the pre-authentication of the documents. This is how we do things. These pretrial stipulations, and they say that right in there. They say, you know, unless it's for the, these are the admissions. These are the facts. This is everything that's going to be tried. And stipulated to by Wolverine. So, I think it's really, really important. And, again, I'm not sure whether your courts have these tremendously detailed pretrial stipulations, whether that's common to federal court or just a Central District thing. But you can't look at any trial that happens without looking at the four corners of the pretrial stipulation. Because that's everything that was at issue. I have one quick one for you. I think that Mr. Moskowitz is making the argument that if you read 303C intelligently, the question is whether the petitioning, the joining creditor had a claim as of the petition date. Do you disagree with that interpretation? I disagree with the interpretation. And so did Judge Clifford, because it says holding, not held. No, no, no. That's a different question. I mean holding as of, if the point of 303C is to judge this as of the petition date, was that claim paid as of the petition date or later? It was paid later. Yeah. Okay. That's my question.  And one of the things I think, oh, I'm sorry. I lost my train of thought on that. Let me ask you a question. Yeah. So is it the implication of your argument that the joining creditor has to at that point hold a claim that was a claim at the petition date? In other words, do both dates apply? I mean suppose somebody came in with a brand-new post-petition claim and said, I want to join. Well, if it's a gap period claim, maybe. But, again, one of the things that I think that one has to realize here, and this is all part of the bad faith argument, which is going on and being continued, continued, continued by Wolverine, hoping without, you know, they're desperately hoping that this panel is going to reverse Judge Clifford so they never have to deal with it. But the bad faith stuff is before the bankruptcy court. And they knew darn well that they needed three creditors when they filed this case. They did. They had, I mean I've got strings of emails between Wolverine and an insurance company of the West where the insurance company of the West lawyer is going, we're not doing this, we're not doing this until you get a third. You've got to get a third. You've got to get a third. You've got to get a third. You've got to get a third. And Wolverine finally goes, oh, we'll go by what John King said and we'll pretend that there aren't 12 creditors and therefore. I'll let you finish your thought, but you are past your time. Okay. I'm sorry. This whole problem was created by Wolverine not bringing in three creditors on the petition date because they didn't have them. Thank you. Okay. Thank you.  Okay. Mr. Moskovitz, you have two minutes and 45 seconds. Please go ahead. I'll make it quick. So let me review the dates again. So Wolverine filed his petition on August 31, 2022, and the debtor, Mr. King, paid it off three days later at the fence factory, that $44 debt. And that payment was on September 2, 2022. Now, Mr. King's counsel just argued that that's the end of it. As soon as Mr. King paid, fence factory is no longer a creditor as of the date that they paid, September 2, 2022. But I'm looking at the list of creditors that Mr. King filed on October 5, 2022, several months later. And on line 20, it lists as a creditor, fence factory, ongoing. Now, why would they do it if they didn't believe that fence factory then had a claim against Mr. King, which is exactly our theory. It's exactly what we're saying in our second two arguments, ignoring the first one, that what counts is whether there was a debt on the date of the petition. This was ongoing. And we have two pieces of evidence that showed that Mr. King owed fence factory on those subsequent dates. And what Mr. King put in his list of creditors is totally consistent with that, and it admits it. On this question of the stipulation that counsel keeps harping on, take a look at it. I'm reading from page 18 of the stipulation, legal issues related to the debtor, whether there are three qualifying petitioning creditors, including, without limitation, the sub-issue of whether fence factory may withdraw its joinder, and whether fence factory was an appropriate petitioning creditor at the time of its joinder. Okay, so it was raised. This was preserved. And let me go back to the point I made earlier that I think has more significance when we give into it. The court mentioned several times to opposing counsel, the record is unclear on this. We don't know whether there's a long-term lease or a month-to-month. And all of those defects fall on them, because this was a motion for summary judgment. They have an obligation to show there's no tribal issue of fact on any of Wolverine's claims. And they didn't do it. And that's the end of it. It's a tribal issue of fact. I just want to end with one short statement, and this case is all about manipulation. Wolverine has tried to enforce its judgment in California state courts in several lawsuits, in San Luis Obispo, in San Francisco. And Mr. King has successfully blocked those, partly by using these other judgments he had his son buy from the creditors. And finally, Wolverine got fed up. We need the assistance of the bankruptcy court to bring all these issues together and get justice here, which, I mean, this man has spent tons of money on attorney's fees to block all these things. He testified at the order of examination that he's not going to take this judgment. It's unfair. And this is like bankruptcy. It's a moral stigma. I'm going to stop you because you've exhausted your time, but thank you very much. I appreciate both of your good arguments, and we'll take the matter under submission. Thank you. And we can call the next case, which is the same lawyers, anyway.
judges: Lafferty, Faris, and Spraker